UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| STEPHANIE R.,[1]<br><br>    Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI,<br><br>    Defendant. | Case No. 19-cv-08052-RMI<br><br>**ORDER ON MOTION FOR SUMMARY JUDGEMENT**<br><br>Re: Dkt. Nos. 25, 29 |

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. *See* AR at 10.[2] Plaintiff filed these applications in February 2015, in which she alleged an onset date of January 1, 2004. *Id.* at 13. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council; thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security, which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(C)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 5 & 12), and both parties have moved for summary judgement (dkts. 25 & 29). On appeal, Plaintiff contends that the ALJ improperly found her to be not disabled at the second step of the five-step evaluative process, and that substantial evidence did not support the ALJ's finding that Plaintiff's impairments were not medically severe. For the reasons stated below, Plaintiff's motion

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("AR"), which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #22. *See* (dkts. 22-1 through 22-10).

for summary judgement is granted, Defendant's motion is denied, and the case is remanded for further proceedings.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence, or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995).

The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff was born in 1987 to alcoholic parents. *See id.* at 387, 400, 401. Her father drank "[ten] beers" and spent "four hours" at a bar daily, whereas her mother "[drank] wine in coffee cups every night." *Id*. at 401. Plaintiff's sister, who is an alcoholic and drug user, physically and verbally abused Plaintiff throughout her adolescence. *Id*. At the age of twelve, Plaintiff developed a chronic pain condition affecting her neck, shoulders, back, knees, and legs. *Id*. at 108, 249, 252, 347, 369, 386. Her parents, however, dismissed the pain as a product of her schizophrenia, and as a result, Plaintiff's condition went untreated throughout her childhood and early adulthood. *Id*. at 257, 312, 315, 399, 400, 437. Nonetheless, she endeavored to live a normal life and dreamt of being a teacher. *Id*. at 66. Plaintiff obtained a high school certification that enabled her to work at

Mount Diablo College as an "instructional" and "daycare" assistant, but as her physical and emotional pain mounted, she began abusing alcohol and methamphetamines, and was psychiatrically hospitalized several times. *Id*. at 66, 75, 108, 312, 314, 338, 400, 402. Plaintiff stopped abusing methamphetamines and alcohol a decade ago (*id*. at 72–73), but continues to experience chronic pain in her neck, shoulders, back, knees, and legs (*see, e.g., id.* at 470, 474, 478, 483, 486, 492, 497, 499, 503, 504).

Although there are gaps in Plaintiff's treatment history, the record before the ALJ included a decade of treating doctors reports and other medical evidence documenting her impairments, including: chronic pain and fibromyalgia (*id*. at 475, 476, 479, 484, 485, 487, 490, 493, 498, 500, 503, 504); arthritis (*id*. at 109, 235, 247, 348, 356, 360, 361, 387, 456, 463, 505, 511); supraspinatus tendinosis (a common cause of shoulder pain) (*id*. at 108, 329, 414); a herniated disc and disc bulge (*id*. at 108–09, 328, 347, 399, 407, 410, 413, 463); scoliosis (*id*. at 470, 474, 478); degenerative cyst (fluid-filled sac in a bone, which forms a joint) (*id*. at 107, 108, 329, 399, 410, 414); joint pain (*id*. at 109, 247, 347, 379, 408, 409, 410, 501, 503); bipolar disorder and schizophrenia (*id*. at 402, 483, 486, 487, 489, 490); insomnia (*id*. at 477, 479, 484, 486, 487, 489, 490); anxiety, depression, and panic attacks (*id*. at 470, 471, 472, 475, 476, 477, 483, 484, 483, 486, 487, 489, 490); and impaired cognitive functioning, somatic symptom disorder, and syncope (temporary loss of consciousness) (*id*. at 475, 480, 481). Yet, the ALJ determined at step two that Plaintiff suffered only three medically determinable impairments—somatic disorder, adjustment disorder, and substance abuse—none of which the ALJ found severe *Id*. at 16.

*Evidence Pertaining to Fibromyalgia, Chronic Pain, and Additional Musculoskeletal Impairments*:

Plaintiff's medical records discuss the symptoms above in tandem; therefore, the court will address these impairments together.

During Plaintiff's hearing before the ALJ in May 2018, the ALJ asked her to discuss the "physical . . . problems" that kept her from working. *Id*. at 68. Plaintiff responded, "I'm in pain a lot . . . but I can't seem to figure out what's wrong. It's the groin tendon . . . [and] both knees hurt." *Id*. at 68. She explained that on "good days," which occur "once or twice a week," she can

3

go "upstairs" or "shower," but those activities lead to bad days, where she remains "in bed" and "only get[s] up to go to the bathroom." *Id*. at 75–76. Plaintiff ultimately spends "[m]ost days in bed." *Id*. at 76. Additionally, Plaintiff's attorney asked what opinion Plaintiff's "neurologist . . . at Kaiser" gave of these issues, noting "it kind of sounded like [the neurologist] . . . didn't know what was wrong." *Id*. at 77. Plaintiff agreed that she "got the idea [the neurologist] didn't know what she was looking [at] exactly . . . ." *Id*.

In addition, Plaintiff's July 2016 Function Report asked how her illness, injury, or condition limited her ability to work. *Id*. at 252. Plaintiff responded that she is "always in pain, [has] muscle weakness, fatigue, spasms in [her] back and legs, cramping in [her] feet[,] [and her] shoulders and knees lock." *Id.* at 252. While Plaintiff is right-handed, she relies on her "uncoordinated" left hand and leg because the "right side of [her] body is (*sic*) failed." *Id*. at 65–66, 259. She uses braces "every day," in addition to a cane and walker, to aid her movements. *Id.* at 258. Due to these limitations, Plaintiff struggles with personal care, including "washing [] hair," "brushing and flossing," and "shaving"—an issue separately observed by her primary care physician of six years, Jana Tomsky, MD, and by her clinical pain and health psychologist, Sophia Cuba, PhD. *Id*. at 75, 107, 253, 400, 472. Plaintiff also reported that she "can't enjoy stuff" like her family wants her to, stopped attending Bible study and having friends over, and instead does activities "laying down with minimal movement," even though laying down is also "uncomfortable." *Id*. at 256, 257. Separately, Plaintiff's partner of ten years submitted a Third-Party Function Report in July 2016, in which he reiterated that Plaintiff spends "most of the day . . . laying down"; struggles with personal care because she is "very limited physically"; uses braces, a cane, and a walker to aid her movements; and ceased attending all social activities. *Id*. at 72, 266, 269, 270, 271.

In May 2016, Plaintiff was referred to a "Chronic Pain Management Program" by Uma S. Desai, MD, for "chronic multiple joint pain." *Id*. at 379, 380, 382. As part of that program, Plaintiff completed a questionnaire in which she explained that her chronic pain began in "childhood" and persisted for "20 years"; her pain "completely interferes" with her "enjoyment of life" and "nearly completely interferences" with her ability to walk and sleep; she uses braces, a

4

cane, and a walker to aid her movements; and members of her immediate family also have "chronic pain." *Id*. at 386, 387, 389, 390, 391.

As to the medical evidence documenting fibromyalgia and chronic pain, Plaintiff submitted treatment and diagnostic records from two physicians and a clinical pain and health psychologist: Between March 2008 and September 2013, Plaintiff's longtime physician, Jana Tomsky, MD, repeatedly diagnosed "fibromyalgia," "fibromyositis," "myalgias," and "chronic pain" (*id*. at 475, 476, 479, 484, 485, 487, 490, 493, 498, 500, 503, 504); and frequently noted back, neck, shoulder, and joint pain (*id*. at 470, 471, 472, 473, 475, 478, 479, 483, 486, 487, 489, 490, 492, 493, 495, 496, 497, 499, 501, 502, 503). Over several years, Dr. Tomsky described Plaintiff's chronic pain at length; for example, recording "sharp" and "ach[ing]" pain, "radiat[ing]" pain, "night pain," "pain aggravated by movement," "body aches," "tenderness," "numbness," "tingling in the arms . . . and legs," and "decreased mobility." *See, e.g., id.* at 470, 474, 478, 483, 486, 492, 497, 499, 503, 504.

Years later, in June 2016, Dr. Tomsky's diagnoses were reiterated by Plaintiff's osteopathic physician, Carlo Esteves, DO, who also assessed chronic pain and identified "polyarticular reactive arthritis," "myofascial pain syndrome," "multiple joint pain," "chronic back pain," and "chronic knee pain." *Id*. at 406–12, 429–30, 433. Dr. Esteves noted Plaintiff's back and bilateral knee pain, herniated disk, and hindered "bending" and "walking," ultimately proposing the "trial of nerve pain medicine." *Id*. at 406–07, 410, 413. Also in June 2016, Plaintiff's psychologist, Sophia Cuba, PhD, diagnosed chronic pain and "polyarticular reactive arthritis" (*id*. at 398–403, 436–37); whereas physician Calvin Pon, MD, diagnosed "[c]hronic right shoulder pain [with] probable internal damage," "[c]hronic low back pain [with] probable lumbar disc disease," and "[c]hronic diffuse joint pains" in his consultative evaluation (*id*. at 349). Dr. Pon also noted that Plaintiff "will have migratory joint pains at different times and with fluctuating joint pain and intensity," and that an X-ray of Plaintiff's right shoulder revealed "calcification [and a] torn rotator cuff detached." *Id*. at 347, 350.

In addition to diagnoses for fibromyalgia and chronic pain, Plaintiff's medical record is replete with additional diagnoses of musculoskeletal impairments, such as arthritis (*id*. at 109, 235,

247, 348, 356, 360, 361, 387, 456, 463, 505, 511); joint pain (*id*. at 109, 247, 347, 379, 408, 409, 410, 501, 503); supraspinatus tendinosis (*id*. at 108, 329, 414); scoliosis (*id*. at 470, 474, 478); a herniated disc and disc bulge (*id*. at 108–09, 328, 347, 399, 407, 410, 413, 463); and, degenerative cyst (*id*. at 107, 108, 329, 399, 410, 414)—all of which support Plaintiff's hearing testimony and self-reported medical history that she experiences debilitating physical pain (*id*. at 242–43, 247, 252–53, 255, 257, 259, 347, 355). Plaintiff's hearing testimony and medical records reflect that despite taking pain medication (*id*. at 70, 361); participating in a chronic pain management program (*id*. at 68, 259, 382); attending physical therapy (*id*. at 69, 256, 259); stretching and practicing yoga (*id*. at 69, 71, 401); receiving acupuncture (*id*. at 259, 364, 370, 386, 390); keeping a pain journal (*id*. at 248); and using medical marijuana (*id*. at 73, 401, 464), she remains "in pain . . .[,] can't see to figure out what's wrong . . .[,] and do[esn't] understand why [she] can't work" (*id*. at 68).

*Evidence Pertaining to Bipolar Disorder and Schizophrenia:*

During Plaintiff's hearing before the ALJ, Plaintiff's attorney discussed her past conservatorship, which began in 2005 after Plaintiff was repeatedly psychiatrically hospitalized. *Id.* at 74, 75. Medical records from the Contra Costa Mental Health Division reveal Plaintiff was hospitalized for "schizoaffective" disorder, despite taking "psychiatric medicines" and seeing a therapist. *Id.* at 312–13, 337–38. Additionally, between February and March 2009, Plaintiff's longtime physician, Jana Tomsky, MD, assessed "bipolar affect disord[er]" and observed a "schizophrenic episode," during which she recorded "psychiatric symptoms," such as "auditory hallucinations" and "paranoi[a]." *Id.* at 483, 486, 487, 489, 490. This diagnosis was reiterated in June 2016 by Plaintiff's psychologist, Sophia Cuba, PhD, who assessed "bipolar or schizoaffective disorder" and described Plaintiff as "clearly impaired." *Id.* at 402.

*Evidence Pertaining to ADHD, Anxiety, Depression, and Insomnia:*

Plaintiff's medical records discuss the symptoms above in tandem; therefore, the court will address these impairments together.

6

In June 2016, Plaintiff completed a pain questionnaire[3] for the Kaiser Permanente Medical Group, where she indicated that her mood swings "very often"; that "nearly every day" she feels "down, depressed, or hopeless"; that she experiences "anxiety attack[s]," "low mood," "low energy," and "shortness of breath"; and that her prescription medications make her feel "funny[,] not better"—all of which place her "depression severity" score at "moderately severe." *Id*. at 383, 385, 387, 388, 391. Plaintiff also reported "[s]leep problems"; "[t]rouble falling asleep" several times per week; "waking up in the night" several times per week; taking medication to fall asleep a couple times per week; and falling sleep ten minutes to a "few hours" after trying. *Id*. at 389.

As to the medical evidence documenting anxiety, depression, and insomnia, Plaintiff submitted treatment and diagnostic records from two physicians and a psychologist: Between March 2008 and September 2013, Plaintiff's longtime physician, Jana Tomsky, MD, recorded that Plaintiff's first depressive "episode" occurred in 1981 at the age of six; that during an episode, Plaintiff manifests "anxious, fearful thoughts," "irritable mood," "diminished interest or pleasure," "fatigue or loss of energy," "poor concentration," "restlessness or sluggishness," and "significant change in appetite"; that Plaintiff has "depression," "anxiety," and "anxiety attacks,"; and that while Plaintiff takes "Prozac every day," she is in "denial" of her depression. *Id*. at 470, 471, 472, 475, 476, 477, 483, 484, 483, 486, 487, 489, 490. Moreover, Dr. Tomsky repeatedly assessed "insomnia," "fatigue," "difficulty going to sleep," and "sleep disturbance." *Id*. at 477, 479, 484, 486, 487, 489, 490. Dr. Tomsky's diagnoses were reiterated across medical records spanning a decade—notably by Plaintiff's prior physician, Arthur Prine, MD, and Plaintiff's psychologist, Sophia Cuba, PhD. *See, e.g., id.* at 337, 338, 339, 437, 505, 511.

//

//

---

[3] Specifically, Plaintiff completed the "Screener and Opioid Assessment for Patients with Pain," which is a tool clinicians use to determine how much monitoring a patient on long-term opioid therapy requires. *Screener and Opioid Assessment for Patients with Pain (SOAPP) Version 1.0 - 14Q*, New Hampshire Medical Society (February 4, 2022, 2:37 PM), https://www.nhms.org/Portals/96/Documents/Resources/SOAPP-14.pdf?ver=2020-09-20-183951-150.

*Evidence Pertaining to Syncope, Seizures, Impaired Cognitive Functioning, and Somatic Symptom Disorder:*

Plaintiff's medical records discuss the symptoms above in tandem; therefore, the court will address these impairments together.

During Plaintiff's hearing before the ALJ, the ALJ asked her to recount her doctor's statements about her health and ability to work, to which Plaintiff responded, "[m]y doctors say my brain turns on and off and saying (*sic*) that it's conversion disorder." *Id*. at 68. Later in the hearing, Plaintiff's attorney asked what Plaintiff's neurologist said about her health, to which Plaintiff responded, "we didn't even know if it was a seizure . . . but I lost consciousness while driving. . . I didn't see it coming." *Id*. at 77–78. In June 2016, Plaintiff also reported having "[s]eizures"; "[l]oss of consciousness"; poor focus; lost thoughts; and "slow" memory in two questionnaires from the Kaiser Permanente Medical Group. *Id*. at 387, 398, 400.

As to the medical evidence documenting syncope, seizures, impaired cognitive functioning, and somatic symptom disorder, Plaintiff submitted treatment and diagnostic records from Plaintiff's longtime physician, Jana Tomsky, MD, who assessed "syncope and collapse," recording that Plaintiff "passed out" in an airport security line; experienced a "few seconds blacked out"; and felt "light[-]headed." *Id*. at 480, 481. Dr. Tomsky also noted Plaintiff's "poor insight, . . . poor judgement, . . . [and] poor attention span and concentration (characterized as slow response)." *Id*. at 475.

Psychologist Rita Sampaio, PhD, also assessed that Plaintiff was mildly cognitively and intellectually impaired, affecting her "memory"; ability to "maintain adequate attention [and] concentration"; "withstand the stress of a routine workday"; and "adapt to changes, hazards, or stressors in [a] workplace setting." *Id*. at 355–57. Dr. Sampaio also diagnosed "[a]djustment [d]isorder" and recommended "continued mental health and medical services." *Id*. at 355–56. Finally, medical records from the Kaiser Permanente Medical Group describe Plaintiff as having "[p]sychiatric instability," as "unable to manage therapy responsibly," and as "meet[ing] criteria for somatic symptom disorder." *Id*. at 402, 505–06.

//

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that he has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ set forth the applicable law under the required five-step sequential evaluation process. *AR* at 14–15. At step one, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date on which the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that although Plaintiff worked after the alleged disability onset date, her "work activity did not rise to the level of substantial gainful activity." *AR* at 15.

At step two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that Plaintiff suffered from the medically determinable impairments of "somatic disorder, adjustment disorder, and substance abuse," but that Plaintiff suffered from no severe impairment or combination of impairments. *AR* at 16. As to Plaintiff's other mental impairments, the ALJ recited disparate material from Plaintiff's medical record without explanation or analysis, concluding that Plaintiff's "bipolar and schizoaffective disorder" and "impaired cognitive functioning" did not cause any significant functional limitations or more than minimally affect her ability to perform basic work activities. *Id*. at 20. The ALJ failed to mention,

let alone discuss and analyze, Plaintiff's insomnia, panic attacks, depression, anxiety, or syncope.

As to Plaintiff's chronic pain and musculoskeletal impairments, the ALJ once again recited disparate material from Plaintiff's medical record without explanation or analysis, concluding that Plaintiff's "thoracic sprain/strain, right shoulder tendonitis, [] myofacial pain syndrome[,] . . . right shoulder pain with probable internal damage, chronic low back pain with probable lumbar disc disease, [] chronic diffuse joint pains[,] . . . [and] chronic mid-back, right hip, and bilateral knee pain," did not cause any significant functional limitations or more than minimally affect her ability to perform basic work activities. *Id.* at 18–19. The ALJ also concluded, without any supported explanation, that Plaintiff's fibromyalgia was "not a medically determinable impairment . . . ." *Id.* at 23–24. The ALJ failed to mention, let alone discuss and analyze, Plaintiff's arthritis, supraspinatus tendinosis, herniated disc, scoliosis, or degenerative cyst. At this point, the ALJ simply concluded that the Plaintiff had not been under a disability as defined in the Social Security Act, and ended his analysis. *Id.* at 25.

**ISSUES PRESENTED**

Although Plaintiff presents several issues for this court's review, essentially, Plaintiff seeks remand for further proceedings based on two errors. The first is the ALJ's failure to adequately develop the record. *See Pl.'s Mot.* (dkt. 25) at 21–23. The second is the ALJ's decision to end his analysis at step two, and identifies three problems with the step two analysis itself: the ALJ's (i) failure to consider and assess numerous diagnosed impairments; (ii) rejection of the opinions of Plaintiff's treating physicians while adopting the opinion of a state examining physician, though it vastly contradicted the longitudinal medical record; and (iii) conclusion, contrary to substantial evidence, that all of Plaintiff's impairments were non-severe. *See Pl.'s Mot.* (dkt. 25) at 5, 17, 24–30; *Pl.'s Repl.* (dkt. 30) at 5). Defendant disagrees in all respects and submits that the ALJ committed no reversible error whatsoever. *See Def.'s Mot.* (dkt. 29) at 28–29.

For the reasons discussed below, the court agrees with Plaintiff's contentions, finding that the ALJ failed to develop the record, and should have continued the sequential analysis beyond step two because there was not substantial evidence to show that Plaintiff's claims were groundless. Moreover, the court agrees the ALJ failed to evaluate Plaintiff's depression, anxiety,

10

and fibromyalgia at step two, in addition to omitting Plaintiff's arthritis, supraspinatus tendinosis, herniated disc, scoliosis, degenerative cyst, insomnia, panic attacks, and syncope from his analysis. *Pl.'s Mot.* (dkt. 25) at 17–21; *see also AR* at 13–25. These omissions—coupled with the ALJ's failure to properly develop the record—infected the entirety of the remainder of the sequential evaluation process.

## DISCUSSION

This is the rare case in which the ALJ performed only the first two steps of the five-step sequential analysis, despite a decade of treatment records from two treating physicians. To make the remarkable determination to end the analysis at step two, the ALJ rejected Plaintiff's hearing and written testimony, a third-party function report from Plaintiff's longtime boyfriend; the opinions of two treating physicians; the opinions of a state agency consultative examiner; and state agency medical consultants. *See AR* at 16–25.

It is well established that an "ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered"—regardless of a claimant's representation status. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150, 1151 (9th Cir. 2001) (internal quotation marks omitted). This duty is heightened where claimants may be mentally impaired and unable to adequately protect their interests. *Id*. (citing *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir. 1992)); *see also DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1990) ("In cases of mental impairments, this duty [to develop the record] is especially important."); *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (Claimants need only "raise a suspicion" about their impairments to trigger an ALJ's duty to develop the record). In fact, when it is necessary to enable the ALJ (and by extension, a reviewing court) to resolve a disability issue, the ALJ's duty to develop the record may require consulting a medical expert or ordering a consultative examination. *See Tonapetyan*, 242 F.3d at 1150 (the ALJ may develop the record in several ways, including by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow for supplementation of the record).

Here, Plaintiff's medical record does not include any treatment information from her

rheumatologist, who received Plaintiff for fibromyalgia; nor does it include treatment information regarding Plaintiff's somatic symptom disorder, which pertains to her chronic pain. *See AR* at 19, 505–06, 510–12; *Pl.'s Mot.* (dkt. 25) at 22. Rather than seeking medical records, opinions, or treatment notes to develop facts on these matters, the ALJ made no mention of Plaintiff's fibromyalgia or somatic symptom disorder during the hearing; failed to contact Plaintiff's rheumatologist; failed to refer Plaintiff to a consultive examiner specializing in rheumatology; and failed to procure complete evaluations from all three consultative examiners, who unanimously omitted fibromyalgia and somatic symptom disorder from their examinations and reports. *See AR* at 62–84; *Pl.'s Mot.* (dkt. 25) at 22. Yet, the ALJ's failure to develop the record did not prevent him from dismissing fibromyalgia for want of "appropriate medical evidence," nor from philosophizing about somatic symptom disorder. *AR* at 23–24 ("[T]he majority of the objective evidence in the record . . . suggests that the claimant's physical symptoms may be related to her mental impairments.").

Defendant asserts that the ALJ "did not have a duty to further develop the record" because (i) Plaintiff "bears the burden of proving that she is disabled"; (ii) Plaintiff "had legal representation at the administrative hearing"; (iii) the SSA searched for Plaintiff's medical records in February 2017 but yielded "no search results"; and (iv) "three consultative examiners already existed in the record." *Def.'s Repl.* (dkt. 29) at 17–18. Defendant's first and second assertions are incorrect because the ALJ must "fully and fairly develop the record" regardless of Plaintiff's burden of proof or representation status—and in special consideration of Plaintiff's numerous mental impairments. *Tonapetyan*, 242 F.3d at 1151. Defendant's third assertion is incorrect because SSA's single, failed search for medical records proves that the record was underdeveloped—*not* "sufficiently developed." *See id*; *Def.'s Repl.* (dkt. 29) at 18. Defendant's last assertion is incorrect because the ALJ's "duty to investigate" is based on "ambiguity in the evidence," not on the number of consultative examiners employed—especially where, as here, all three consultative examiners produced incomplete evaluations. *Tonapetyan*, 242 F.3d at 1151; *see Pl.'s Mot*. (dkt. 25) at 22. Moreover, the ALJ rejected the opinions of the medical consultants, one of the medical examiners, and the psychological consultants that he employed. *See AR* at 19, 22

("The undesigned has given little weight to the opinions of the State agency medical consultants[;]. . . little weight to the opinion of [consultative examiner] Dr. Pon[;] . . . and little weight to the opinions of State agency psychological consultants.").

An impairment or combination of impairments may be found "not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686–87 (9th Cir. 2005) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (internal quotation marks omitted) (emphasis added)); *see also Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988). The Commissioner stated that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." S.S.R. No. 85-28 (1985). Step two, then, is "a de minimis screening device [used] to dispose of groundless claims," *Webb*, 433 F.3d at 687 (quoting *Smolen*, 80 F.3d at 1290), and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is "clearly established by medical evidence." S.S.R. 85–28. Thus, applying the normal standard of review to the requirements of step two, the court must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that Plaintiff did not have a medically severe impairment or combination of impairments. *Webb*, 433 F.3d at 687; *see also Yuckert,* 841 F.2d at 306 ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.").

In this case, the ALJ found that Plaintiff suffered only from somatic disorder, adjustment disorder, and substance abuse, despite objective medical evidence documenting chronic pain and fibromyalgia (*id*. at 475, 476, 479, 484, 485, 487, 490, 493, 498, 500, 503, 504); arthritis (*id*. at 109, 235, 247, 348, 356, 360, 361, 387, 456, 463, 505, 511); supraspinatus tendinosis (a common cause of shoulder pain) (*id*. at 108, 329, 414); a herniated disc and disc bulge (*id*. at 108–09, 328, 347, 399, 407, 410, 413, 463); scoliosis (*id*. at 470, 474, 478); degenerative cyst (fluid-filled sac in a bone, which forms a joint) (*id*. at 107, 108, 329, 399, 410, 414); joint pain (*id*. at 109, 247, 347,

13

379, 408, 409, 410, 501, 503); bipolar disorder and schizophrenia (*id*. at 402, 483, 486, 487, 489, 490); insomnia (*id*. at 477, 479, 484, 486, 487, 489, 490); anxiety, depression, and panic attacks (*id*. at 470, 471, 472, 475, 476, 477, 483, 484, 483, 486, 487, 489, 490); and impaired cognitive functioning, somatic symptom disorder, and syncope (temporary loss of consciousness) (*id*. at 475, 480, 481). Although the medical record paints an incomplete picture of Plaintiff's overall health during the relevant period, it includes evidence of problems sufficient to pass the de minimis threshold of step two. *Webb*, 433 F.3d at 687; *see also Smolen*, 80 F.3d at 1290.

Moreover, the ALJ's reasons for rejecting Plaintiff's complaints at step two are not sufficient to meet the "clear and convincing" standard when balanced against Plaintiff's doctors' contemporaneous observations and Plaintiff's subjective complaints. *Webb*, 433 F.3d at 687; *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing.") (internal citation and quotation marks omitted). The ALJ found that Plaintiff's "physical symptoms" may be the product of "psychological embellishment" or "related to her mental impairments" (*AR* at 19) because she performs some household tasks, such as grocery shopping and driving (*id*. at 17–18, 21); cares for her personal needs (*id*. at 18, 21); performed some work activity between 2005 and 2008, although it was "less than substantial gainful activity" (*id*. at 18); "paid attention and was able to participate appropriately throughout the hearing" (*id*. at 22); appeared "cooperative," "pleasant" and generally responsive during two consultative evaluations in 2016 (*id*. at 20, 21); and improved with depression medication (*id*. at 20).

However, the medical record indicates that many of Plaintiff's physical symptoms, such as right shoulder pain and diffuse joint pain, were due to musculoskeletal abnormalities observable in Plaintiff's X-ray and MRI results. *Id*. at 347, 349. Moreover, the record reflects that Plaintiff's psychological condition, including her depression and anxiety, fluctuated even while taking medication. *See, e.g., id*. at 383, 385, 387, 388, 391, 470, 471, 472, 475, 476, 477, 483, 484, 483, 486, 487, 489, 490. That Plaintiff sought employment over a decade ago suggests no more than that she was doing her utmost, in spite of her health, to support herself. *See Webb*, 433 F.3d at 688.

14

"The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [her] credibility as to [her] overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." *Id*. (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (internal citation omitted)).

The ALJ also viewed Plaintiff's objective medical evidence simply as part of her subjective complaints when finding Plaintiff's assertions to be of "psychological embellishment." Credibility determinations do bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or inconsistency between a claimant's subjective complaints and her diagnosed conditions. *Webb*, 433 F.3d at 688; s*ee also Batson v. Comm'r of Soc. Sec. Adm'n*, 359 F.3d 1190, 1195 (9th Cir. 2004). But there is no inconsistency between Plaintiff's complaints and her doctors' diagnoses sufficient to doom her claim as groundless under the *de minimis* standard of step two. Plaintiff's clinical records did not merely record the complaints she made to her physicians, nor did her physicians dismiss Plaintiff's complaints as altogether unfounded. To the contrary, her doctors' reports usually corresponded with the afflictions she perceived, particularly her chronic pain, anxiety, and depression.

Lastly, within the ALJ's step two analysis, Plaintiff asserts a failure to evaluate Plaintiff's depression, anxiety, and fibromyalgia. *Pl.'s Mot.* (dkt. 25) at 17–21. In fact, review of the ALJ's decision reveals a failure to mention—let alone evaluate—Plaintiff's arthritis, supraspinatus tendinosis, herniated disc, scoliosis, degenerative cyst, insomnia, panic attacks, depression, anxiety, and syncope. *See AR* at 13–25. Defendant does not expressly concede this assertion but does not dispute it either, which the court takes as a concession. *See Def.'s Repl.* (dkt. 29) at 8–29.

An ALJ is precluded from ignoring evidence of an impairment or combination of impairments presented by a claimant. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (error for an ALJ to ignore competent evidence in the record in order to justify his conclusion); and *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982) ("[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.") (citation omitted); *see also* 20 C.F.R. § 404.1520(a)(3) ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled.") (emphasis added). Where an ALJ

15

does not give any reason for omitting diagnosed conditions as medically determinable impairments, courts routinely find error. *See, e.g., Achakzai v. Berryhill*, No. 18-cv-07005-JCS, 2020 WL 1450554, at *21 (N.D. Cal. Mar. 25, 2020) (finding error where the ALJ did not acknowledge that treating physicians had diagnosed the claimant with PTSD, depression, and anxiety); *Cullen v. Saul*, No. 18-cv-01576-RMI, 2019 WL 3430618, at *8-9 (N.D. Cal. July 30, 2019) (finding error where ALJ did not acknowledge multiple impairments at Step Two).

Here, the ALJ omitted ten diagnosed conditions. *See AR* at 13–25. Instead of addressing each impairment, the ALJ recited select portions of the medical record pertaining only to Plaintiff's physical and mental symptoms; omitted all diagnoses pertaining to these symptoms; and omitted evidence pertaining to the duration and severity of these symptoms. *Id*. Defendant ignores all omissions except Plaintiff's anxiety and depression, responding that "Plaintiff only presented a diagnosis from her primary care physician, Jana Tomsky . . . without additional evidence in support of her contention that these impairments were severe," and that "Plaintiff offered no medically acceptable clinical and laboratory diagnostic techniques in support of her contentions." *Def.'s Repl.* (dkt. 29) at 13. Defendant is incorrect because Plaintiff presented four sources of evidence in support of her diagnoses for anxiety and depression—all of which the ALJ ignored or dismissed: Plaintiff's pain questionnaire for the Kaiser Permanente Medical Group; Plaintiff's longtime primary care physician, Jana Tomsky, MD; Plaintiff's prior physician, Arthur Prine, MD; and Plaintiff's psychologist, Sophia Cuba, PhD. *See, e.g., AR* at 337, 338, 339, 383, 385, 387, 388, 391, 437, 470, 471, 472, 475, 476, 477, 483, 484, 483, 486, 487, 489, 490, 505, 511. Doctors Tomsky, Prine, and Cuba all assessed anxiety and depression in their treatment notes, in addition to Plaintiff's written and verbal attestations—all of which amount to medical evidence that the ALJ must not but did ignore. *See id.* Furthermore, while the ALJ acknowledged Plaintiff's fibromyalgia diagnoses, he failed to assess the impairment, stating instead that (i) Plaintiff's "diagnosis was not carried forward after 2010; and (ii) Plaintiff did not meet "two sets of criteria for diagnosing fibromyalgia [as] described in sections II.A and II.B of SSR 12-2p." *AR* at 25.

Therefore, the ALJ's failure to assess numerous diagnosed impairments; his failure to

16

properly evaluate fibromyalgia, depression, anxiety; and his failure to develop the record regarding fibromyalgia and somatic symptom disorder are all reversible error. While it is unclear whether Plaintiff will succeed in proving that she is disabled and entitled to benefits, it is clear that the ALJ lacked substantial evidence to find that the medical evidence clearly established Plaintiff's lack of a medically severe impairment or combination of impairments. The ALJ should have continued the sequential analysis beyond step two because there was not substantial evidence to show that Plaintiff's claim was "groundless." *Webb*, 433 F.3d at 687; *see also Smolen*, 80 F.3d at 1290.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 25) is **GRANTED**, and Defendant's Cross-Motion (dkt. 29) is **DENIED**. The case is **REMANDED** for further proceedings such that the ALJ can fully develop the record and perform a proper Step Two analysis.

**IT IS SO ORDERED.**

Dated: March 9, 2022

ROBERT M. ILLMAN
United States Magistrate Judge